## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GUILLERMO MARTI and FELICIA MARTI JT TEN, derivatively on behalf of LIVEPERSON, INC., | Case No.: |
| Plaintiffs, | |
| v. | **DEMAND FOR JURY TRIAL** |
| ROBERT LOCASCIO, JOHN COLLINS, PETER BLOCK, ERNEST CU, BRUCE HANSEN, JILL LAYFIELD, KEVIN C. LAVAN, FRED MOSSLER, VANESSA PEGUEROS, WILLIAM G. WESEMANN, and YAEL ZHENG, | |
| Defendants, | |
| and | |
| LIVEPERSON, INC., | |
| Nominal Defendant. | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Guillermo Marti and Felicia Marti JT Ten ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant LivePerson, Inc. ("LivePerson" or the "Company"), file this Verified Shareholder Derivative Complaint against defendants Robert LoCascio ("LoCascio"), John Collins ("Collins"), Peter Block ("Block"), Ernest Cu ("Cu"), Bruce Hansen ("Hansen"), Jill Layfield ("Layfield"), Kevin C. Lavan ("Lavan"), Fred Mossler ("Mossler"), Vanessa Pegueros ("Pegueros"), William G. Wesemann ("Wesemann"), and Yael Zheng ("Zheng") (collectively, the "Individual Defendants" and with LivePerson, "Defendants") for breaches of their fiduciary duties as directors and/or officers of

LivePerson, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants LoCascio and Collins for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LivePerson, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by LivePerson's directors and officers and/or former directors and officers from May 10, 2022 to March 16, 2023, inclusive (the "Relevant Period").

2.      LivePerson is a Delaware corporation based in New York City that provides online and mobile messaging solutions through conversational artificial intelligence. Since November 1998, LivePerson has offered online and mobile messaging solutions for businesses, purportedly providing businesses with "conversational solutions to orchestrate humans and AI, at scale, and

create a convenient and personalized relationship with their customers." The Company went public via an initial public offering ("IPO") on the NASDAQ Stock Market ("NASDAQ") in April 2000.

3.    LivePerson's "Conversational Cloud" enables customers to interact with chat bots, or automated internet chat robots, across "each of a brand's primary digital channels, including mobile apps, mobile and desktop web browsers, SMS, social media, and third-party consumer messaging platforms." This service purportedly allows human agents to manage customer correspondence in a more streamlined and efficient manner, by giving customers solutions more quickly via chat text as opposed to making them wait on hold on a phone call. LivePerson's Conversational Cloud also purports to "ingest traditional emails and convert them into messaging conversations, or embed messaging conversations directly into web advertisements, rather than redirect consumers to static website landing pages."

4.    In February 2022, LivePerson acquired Kentucky-based WildHealth, Inc. ("WildHealth"), a precision medicine service which purports to "leverage[] advanced machine learning to combine DNA analysis, biometrics, microbiome testing and phenotypic data to provide people with a blueprint for truly optimized health and a maximized health span." Through its business model, WildHealth frequently receives reimbursements from Medicare programs for furnishing certain services.

5.    In November 2022—just months after LivePerson's acquisition of WildHealth—WildHealth was notified that certain reimbursements for its services provided under a Medicare demonstration program pertaining to COVID-19 testing (the "Testing Program") were suspended pending further review. However, despite being aware of this, throughout the Relevant Period, Defendants failed to disclose to investors that WildHealth's Medicare reimbursements under the

Testing Program had been suspended, instead representing to investors, *inter alia*, that the Company "expect[ed] continued strong performance by WildHealth" and that there were no material changes in the Company's internal control over financial reporting.

6.      The truth began to emerge on February 28, 2023 when, before the market opened, LivePerson issued a Notification of Late Filing on Form 12b-25 with the SEC for its Annual Report on Form 10-K (the "2022 10-K") for the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"). The Notification of Late Filing revealed that, due to the Company's acquisition of WildHealth, "the Company requires more time to perform additional review and testing of revenue recognition with respect to a recently discontinued WildHealth program, for which Medicare reimbursement is suspended pending further governmental review, and to complete its in-process review of internal controls and procedures."

7.      On this news, the Company's share price fell $1.69 per share, or 14.31%, from a closing price of $11.81 on February 27, 2023 to close at $10.12 per share on February 28, 2023.

8.      Just over a week later, before the market opened on March 6, 2023, LivePerson filed a Form 8-K with the SEC which revealed that "the referenced review of WildHealth revenue is anticipated to affect fourth quarter 2022 revenue attributable to WildHealth's participation in a Medicare demonstration program, due to suspension in November 2022 of Medicare reimbursements under the program and pending further governmental review."

9.      On this news, the Company's share price fell $0.78 per share, or 6.8%, from a closing price of $11.47 on March 6, 2023 to close at $10.69 per share on March 7, 2023.

10.      The truth continued to emerge on March 15, 2023 when, after the market had closed, LivePerson issued a press release announcing the Company's fourth quarter of 2022

4

financial results. The press release revealed that "[t]otal revenue was $122.5 million for the fourth quarter of 2022, a decrease of 1% as compared to the same period last year" and "[w]ithin total revenue, business operations revenue for the fourth quarter of 2022 decreased 1% from the comparable prior-year period to $113.0 million, and revenue from consumer operations decreased 3% from the comparable prior-year period to $9.4 million."

11.     The truth fully emerged the following day, March 16, 2023, when, before the market opened, the Company filed its 2022 10-K with the SEC. The 2022 10-K revealed that "due to certain control deficiencies which aggregated to a material weakness in the Company's internal control over financial reporting as further described below, our disclosure controls and procedures were not effective as of December 31, 2022" and "[t]he control deficiencies, which in aggregate constitute a material weakness, were identified in connection with the Company's previously disclosed review of certain transactions related to its subsidiary WildHealth."

12.     On this news, the Company's share price went into free fall, dropping $5.64 per share, or 57.73%, from a closing price of $9.77 per share on March 15, 2023 to close at $4.13 per share on March 16, 2023.

13.     On July 12, 2023, the Company announced that Defendant LoCascio would depart his role as LivePerson's Chief Executive Officer ("CEO"), effective December 31, 2023 at the end of the term of his contract, which would not be renewed. On August 8, 2023, the Company announced that Defendant Collins, the Company's Chief Financial Officer ("CFO"), had been appointed to the additional role of interim CEO, and that, in connection with his appointment, Defendant LoCascio had stepped down as CEO and as a Company director, effective August 7, 2023.

14.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's internal controls pertaining to disclosure controls and procedures were materially ineffective; (2) the Company failed to maintain internal controls over financial reporting, as they contained material weaknesses; (3) as a result, the Company failed to disclose the suspension of WildHealth's Medicare reimbursements under the Testing Program and the resulting impact on LivePerson's future revenues; and (4) as a further result, the Company exaggerated and overstated its business prospects and overall financial position. As a result of the foregoing, Defendants' statements about LivePerson's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, Defendant Collins sold Company shares at inflated prices for total proceeds of over $4,445.

16.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing LivePerson to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 19,830 shares of the Company's common stock were repurchased from Defendant Collins between November 1, 2022 and November 30, 2022 for over $221,501. As the Company's stock was actually only worth $4.13

6

per share, the price at which it was trading when markets closed on March 16, 2022, the Company overpaid for repurchases of its own stock by over $139,403 in total.

17.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

18.    In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO, and its CFO/former Interim CEO/Chief Operating Officer ("COO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, losses from the repurchases of Company stock at artificially inflated prices due to the foregoing misrepresentations, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the former CEO's and CFO/interim CEO/COO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation

against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, 15 U.S.C. § 78u-4(f), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and LivePerson is headquartered in this District.

## PARTIES

### Plaintiffs

26.     Plaintiffs are current shareholders of LivePerson. Plaintiffs have continuously held LivePerson common stock since December 14, 2004. Plaintiffs are citizens of Costa Rica.

### Nominal Defendant LivePerson

27.     LivePerson is a Delaware corporation with its principal executive offices at 475 10th Avenue, 5th Floor, New York, New York 10018. LivePerson's shares trade on the NASDAQ under the ticker symbol "LPSN."

### Defendant Block

28.     Defendant Block served as a Company director from 2010 until he resigned from the Board on August 4, 2022. During his time as a director, Defendant Block served on the Compensation Committee. According to the proxy statement the Company filed with the SEC on July 21, 2022 (the "2022 Proxy Statement"), as of June 10, 2022, Defendant Block beneficially owned 122,817 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 10, 2022 was $13.76, Defendant Block owned approximately $1.7 million worth of LivePerson stock as of that date.

29.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Block received $257,684 in total compensation from the Company, consisting entirely of stock awards.

30.     The 2022 Proxy Statement stated the following about Defendant Block:

Mr. Block brings experience in management consulting and organizational development, and has been President of Peter Block Inc., a management consulting group, and a partner in Designed Learning, a training company that offers both in-person and virtual workshops designed by Mr. Block to build organizational development skills, since 1997. Mr. Block is also a best-selling author of several

books about organizational dynamics, community and accountability. Among other awards, Mr. Block has received the Organizational Development Network's Lifetime Achievement Award, the American Society for Training and Development Award for Distinguished Contributions, and the Association for Quality and Participation President's Award. He is also a member of Training Magazine's HRD Hall of Fame. Mr. Block holds a B.S. degree in Industrial Administration from the University of Kansas and an M.S. degree in Industrial Administration from Yale University.

Mr. Block brings to the Board significant expertise on hiring, enabling and retaining talent, building high-performance internal teams and maintaining a diverse, inclusive and engaged workforce and unique perspective on organizational design.

31.     Upon information and belief, Defendant Block is a citizen of Ohio.

**Defendant Collins**

32.     Defendant Collins has served as the Company's CFO since February 2020 and as the Company's COO since January 10, 2024. Previously, Defendant Collins served as the Company's Interim CEO from August 7, 2023 until January 10, 2024 and as the Company's Senior Vice President of Quantitative Strategy from September 2019 until February 2020. According to the proxy statement the Company filed with the SEC on September 8, 2023 (the "2023 Proxy Statement"), as of August 11, 2023, Defendant Collins beneficially owned 83,860 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 11, 2023 was $5.08, Defendant Collins owned approximately $426,009 worth of LivePerson stock as of that date.

33.     For the 2022 Fiscal Year, Defendant Collins received $4,408,986 in total compensation from the Company. This included $506,250 in salary, $3,745,412 in stock awards, $118,336 in non-equity incentive plan compensation, and $38, 988 in all other compensation.

34.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Collins made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 1, 2022 | 412 | $10.79 | $4,445 |

Thus, in total, before the fraud was exposed, he sold 412 shares of Company stock on inside information, for which he received approximately $4,445 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

35.     The 2023 Proxy Statement stated the following about Defendant Collins:

John D. Collins, 41, has served as our Interim Chief Executive Officer since August 2023 and our Chief Financial Officer since February 2020. Drawing on his experience as a founder, data scientist, and institutional investor, John brings a modern vision and skillset to his work. As CFO, he has played a critical role in driving LivePerson's corporate strategy and business development efforts, including successfully executing M&A, divestiture, and capital markets transactions. Mr. Collins joined LivePerson in September 2019 to lead the development of automations and machine learning to support strategic decision making and predictive analytics as SVP of Quantitative Strategy. In 2013, Mr. Collins co-founded Thasos, a New York City-based predictive intelligence company powering large-scale equity trading platforms. Mr. Collins served in various capacities at Thasos, including, most recently, as an Advisory Board Member, as its Chief Product Officer (2016–2019) and as its Portfolio Manager (2013–2016). Prior to that, Mr. Collins held roles in the financial services industry, including regulating financial firms at the NYSE, and structuring transactions in leveraged finance at Credit Suisse. Mr. Collins received his J.D. from Chicago-Kent College of Law at Illinois Institute of Technology, his M.B.A. from the Massachusetts Institute of Technology, and his B.S. from the University of Central Florida.

36.     Upon information and belief, Defendant Collins is a citizen of California.

**Defendant Cu**

11

37.    Defendant Cu served as a Company director from April 2021 until he resigned from the Board on February 7, 2023. He previously served as a member of the Social Impact and Culture Committee. According to the 2022 Proxy Statement, as of June 10, 2022, Defendant Cu beneficially owned 6,740 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 10, 2022 was $13.76, Defendant Cu owned approximately $92,742 worth of LivePerson stock as of that date.

38.    For the 2022 Fiscal Year, Defendant Cu received $200,010 in total compensation from the Company, consisting entirely of stock awards.[1]

39.    The 2022 Proxy Statement stated the following about Defendant Cu:

Mr. Cu brings a long history of executive leadership experience, having served as Executive Director, President and Chief Executive Officer of Globe Telecom, Inc. (PSE: GLO), a major publicly traded telecommunications provider in the Philippines, since April 2009, and as President and CEO of SPi Technologies from 1997 to 2008. He is considered to be one of the founding originators of the business process outsourcing business model in the Philippines in recognition of his immense contributions to the telecommunications industry. Mr. Cu also brings valuable finance experience as a former executive at Bank of America and former director of Maybank ATR Kim Eng Financial Corp. Mr. Cu has extensive experience as a director of a variety of private companies, including AF Payments (Beep), a financial services company. Mr. Cu has previously been recognized by Ernst & Young as "ICT Entrepreneur of the Year," and, on two occasions each, was recognized by Finance Asia as the "Philippines' Best CEO" and by Frost & Sullivan as "CEO of the Year." He was also recognized as one of the 100 most influential telecom leaders worldwide by London-Based Global-Telecoms Business Magazine's Power 100 for five consecutive years. Mr. Cu holds a B.S. degree in Industrial Management Engineering from De La Salle University in Manila and an M.B.A. degree from the J.L. Kellogg Graduate School of Management at Northwestern University.

Mr. Cu brings to the Board a global perspective in areas such as global contact centers, infrastructure modernization, sustainability and product innovation, with

---

[1] Defendant Cu had received $235,010 in total compensation from the Company for the 2022 Fiscal Year but returned his $35,000 in cash fees paid to him in 2022 in connection with his resignation.

particular expertise in telco communications and consumer offerings, and extensive expertise in financial and operational management and business transformation.

40.     Upon information and belief, Defendant Cu is a citizen of the Philippines.

**Defendant Hansen**

41.     Defendant Hansen has served as a Company director since December 2022. He also currently serves as a member of the Company's Audit Committee and Operating Committee.

42.     The 2023 Proxy Statement stated the following about Defendant Hansen:

Mr. Hansen brings three decades of experience building companies across the burgeoning big data, AI/analytics, and fintech industries to LivePerson. He previously co-founded and served as Chairman and CEO of ID Analytics (now part of LexisNexis Risk Solutions), a leader in consumer risk management software solutions from 2002 to 2012. Prior to ID Analytics, Mr. Hansen was President at HNC Software Inc., a global AI software provider in financial services, wireless, and healthcare, which was acquired by FICO in 2002. Earlier in his career, he held executive roles at Center for Adaptive Systems Applications (CASA) Inc., CitiGroup, ADP, and JPMorgan Chase. Currently, Mr. Hansen serves as board chair at Verisk Analytics, Inc., which offers leading data analytics technology, and board member at Mitek Systems, Inc., a provider of identity verification solutions. Previously, Mr. Hansen served on the boards of RevSpring, Inc., a private company providing consumer communications, billing, and payments solutions, GDS Link, a private provider of customer-centric risk management and process automation solutions, Performant Financial Corp, a healthcare payment integrity company, and Zyme, a leading channel data management cloud platform that is now part of E2Open. Mr. Hansen holds an M.B.A. in finance from The University of Chicago's Booth School of Business and an A.B. in economics from Harvard University.

Mr. Hansen brings to the Board management and operations experience gained as a senior executive of multiple data analytics businesses, current and past service on other public company boards, and a global perspective in areas such as product innovation and technology expertise, with particular knowledge of AI and fintech.

43.     Upon information and belief, Defendant Hansen is a citizen of California.

**Defendant Lavan**

44.     Defendant Lavan has served as Company director since January 2000. He also serves as a member of the Company's Compensation Committee, Operating Committee, and Chair

of the Company's Audit Committee. According to the 2023 Proxy Statement, as of August 11, 2023, Defendant Lavan beneficially owned 189,041 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 11, 2023 was $5.08, Defendant Lavan owned approximately $960,328.28 worth of LivePerson stock as of that date.

45.     For the 2022 Fiscal Year, Defendant Lavan received $267,510 in total compensation from the Company. This included $67,500 in fees earned or paid in cash and $200,010 in stock awards.

46.     The 2023 Proxy Statement stated the following about Defendant Lavan:

Mr. Lavan currently serves as Chief Financial Officer of Autoclear LLC, a designer, builder and distributor of security systems, a role he has held since February 2016. Prior to his current role, Mr. Lavan was an independent consultant to the media and entertainment industries, building on his leadership experience across entertainment, media and direct and digital marketing. Between April 2010 and December 2014, Mr. Lavan was a Senior Vice President, Worldwide Controller of IMG, an international and diversified sports, entertainment and media company. He also served in various executive roles at Paradysz Matera Company, Inc., MDCPartners, Inc., Now Marketing, Inc. and Wunderman, a marketing division of Young & Rubicam Inc., and previously served as an independent consultant to marketing services organizations. While at Now Marketing, Inc., Mr. Lavan invented NowCode, a product that was used in several television promotions including by NBC for a sweepstakes for the 2002 Winter Olympics. Earlier in Mr. Lavan's career, he held various finance roles at Young & Rubicam, Viacom Inc. and Viacom's subsidiary, MTV Networks. Mr. Lavan holds a B.S. degree from Manhattan College and is a Certified Public Accountant. Mr. Lavan brings to the Board a highly relevant perspective in digital marketing and advertising, as well as extensive operating and financial senior management experience.

47.     Upon information and belief, Defendant Lavan is a citizen of New Jersey.

**Defendant Layfield**

48.     Defendant Layfield has served as the Chair of the Board since July 2023 and as a Company director since November 2016. She previously served as the Lead Independent Director.

Defendant Layfield also serves as a member of the Company's Audit Committee, Nominating and Corporate Governance Committee, and as Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of August 11, 2023, Defendant Layfield beneficially owned 155,971 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 11, 2023 was $5.08, Defendant Layfield owned approximately $792,333 worth of LivePerson stock as of that date.

49.     For the 2022 Fiscal Year, Defendant Layfield received $265,010 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $200,010 in stock awards.

50.     The 2023 Proxy Statement stated the following about Defendant Layfield:

Ms. Layfield has been Chair of the Board since July 2023 and previously served as the Lead Independent Director. She has served as CEO of James Michelle Jewelry, a digitally-native, direct-to-consumer, jewelry company since June of 2022. Ms. Layfield co-founded Tamara Mellon, a digitally-native, luxury retail company, where she served as CEO from July 2016 to December 2021 and assisted in launching the first-ever digitally-led, direct-to-consumer luxury footwear brand. From November 2004 until July 2016, Ms. Layfield served in various roles at Backcountry.com, including as President and CEO from January 2011 to December 2015. During her time at Backcountry.com, she significantly grew the company and successfully sold the business to TSG Consumer Partners for $350 million. Ms. Layfield also held various marketing positions at several major Silicon Valley companies. Ms. Layfield currently sits on the board of directors for The Orvis Company. Additionally, Ms. Layfield previously sat on the boards of directors of Camber Outdoors and SmartPak Equine. Ms. Layfield received a B.A. degree in Communications—Journalism from Santa Clara University. Ms. Layfield is recognized as an innovator and industry expert in combining organizational change and advanced technologies to retool customer care for the digital, mobile era.

Ms. Layfield brings to the Board a deep experience in the retail and technology sector, operational expertise and unique expertise transforming customer experience and forging meaningful, high-quality connections between brands and consumers.

51.     Upon information and belief, Defendant Layfield is a citizen of California.

**Defendant LoCascio**

52.     Defendant LoCascio founded the Company in 1995. From 1995 until August 2023, he served as the Company's CEO and Chair of the Board, until he stepped down from both roles effective August 7, 2023. According to the 2023 Proxy Statement, as of August 11, 2023, Defendant LoCascio beneficially owned 5,193,207 shares of the Company's common stock, or 7% of the total common stock outstanding of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on August 11, 2023 was $5.08, Defendant LoCascio owned approximately $26.3 million worth of LivePerson stock as of that date.

53.     For the 2022 Fiscal Year, Defendant LoCascio received $2,955,255 in total compensation from the Company. This included $611,820 in salary, $2,055,481 in stock awards, $260,024 in Non-Equity Incentive Plan Compensation, and $27,930 in all other compensation.

54.     The 2022 Proxy Statement stated the following about Defendant LoCascio:

Mr. LoCascio has been CEO and Chairman since founding the Company in 1995 with the invention of Web Chat. As founder and CEO, Mr. LoCascio deeply understands the technology and business of LivePerson and has been an integral part of driving the Company's market leadership in Conversational Artificial Intelligence and building its best-in-class AI platform. In addition to his role at LivePerson, Mr. LoCascio is a founding board member of EqualAI, an organization which works with companies, policymakers, and experts to reduce bias in AI. Mr. LoCascio has been widely recognized for his leadership in the technology space and was the winner of the 2015 Smart CEO Circle of Evidence Award and was named a New York City Ernst & Young Entrepreneur of the Year finalist in 2001 and 2008. Mr. LoCascio is also a founding member of the NYC Entrepreneurs Council of the Partnership for New York City. In 2001, Mr. LoCascio started the Dream Big Foundation with its first program, FeedingNYC, which gives families in need a Thanksgiving dinner. To date, FeedingNYC has delivered meals to approximately 90,000 families. Its second program, the Dream Big Entrepreneurship Initiative, launched in 2014 to fund, mentor, coach and empower local entrepreneurs in underserved communities. Mr. LoCascio received a B.B.A. degree from Loyola College.

16

Mr. LoCascio brings to the Board a unique perspective of LivePerson's business and his strategic vision and operational insights as the Company founder and CEO. In addition, the Company values Mr. LoCascio's extensive technology experience, specifically in the cloud-based technologies space, as well as his strong entrepreneurial background.

55.     Upon information and belief, Defendant LoCascio is a citizen of New York.

**Defendant Mossler**

56.     Defendant Mossler served as a Company director from 2017 until he retired from the Board on October 5, 2023. He previously served as a member of the Compensation Committee and the Nominating and Corporate Governance Committee and as Co-Chair of the Social Impact and Culture Committee. According to the 2023 Proxy Statement, as of August 11, 2023, Defendant Mossler beneficially owned 150,519 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 11, 2023 was $5.08, Defendant Mossler owned approximately $764,637 worth of LivePerson stock as of that date.

57.     For the 2022 Fiscal Year, Defendant Mossler received $257,010 in total compensation from the Company. This included $57,500 in fees earned or paid in cash and $200,010 in stock awards.

58.     The 2022 Proxy Statement stated the following about Defendant Mossler:

Mr. Mossler brings experience as an executive, investor and entrepreneur. He has been an independent consultant, entrepreneur and philanthropist since June 2016. From August 1999 until June 2016, Mr. Mossler worked in various senior leadership positions at Zappos, including Senior Vice President of Merchandising, and helped Zappos grow into a company with more than $1 billion in gross merchandise sales before it was bought by Amazon in 2009. From September 1991 to August 1999, Mr. Mossler worked in various positions at Nordstrom. In addition to Mr. Mossler's career in e-commerce and retail, he assisted with the launch and building of, and previously served on the board of, Downtown Project, a company dedicated to helping revitalize part of downtown Las Vegas through investment in small businesses, tech startups, real estate, arts, culture and education. Mr. Mossler founded Honus Capital LLC, a hands-on investment fund for Las Vegas-area

entrepreneurs. He also co-founded the popular Mexican restaurant chain Nacho Daddy. Mr. Mossler graduated from Southern Oregon University with a B.S. degree in Business.

Mr. Mossler brings to the Board significant expertise in call center services, in addition to extensive experience in consumer-facing industries and consumer experience more broadly. Mr. Mossler also has extensive experience in assisting with business growth and providing both knowledge of technology, e-commerce, and product merchandising knowledge.

59.     Upon information and belief, Defendant Mossler is a citizen of Nevada.

**Defendant Pegueros**

60.     Defendant Pegueros has served as Company director since December 2022. She also serves as a member of the Company's Compensation Committee, Nominating and Corporate Governance Committee, and Chair of the Operating Committee. According to the 2023 Proxy Statement, as of August 11, 2023, Defendant Pegueros beneficially owned 49 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 11, 2023 was $5.08, Defendant Pegueros owned approximately $248.92 worth of LivePerson stock as of that date.

61.     The 2023 Proxy Statement said the following about Defendant Pegueros:

Ms. Pegueros brings over three decades of experience and leadership in software, technology and cybersecurity to LivePerson. Most recently, she served as the Chief Trust & Security Officer of Onelogin, Inc., the identity platform for secure, scalable and smart experiences that connect people to technology. Prior to that, Ms. Pegueros served as Vice President and Chief Information Security Officer of DocuSign, Inc., the world's leading way to electronically sign and manage contracts. Ms. Pegueros also previously served as Senior Vice President of Information Security at U.S. Bancorp; Chief Information Security Officer at Expedia Group, Inc.; and First Vice President, Security Assessment Services at Washington Mutual, Inc. Currently, Ms. Pegueros serves on the board of Prisidio Inc., a cloud-based secure digital vault, and as a member of the board and the Audit Committee of Boeing Employee Credit Union. Previously, Ms. Pegueros served on the board of Carbon Black, Inc., an endpoint security company, which was acquired by VMware, Inc. in October 2019. Ms. Pegueros holds an M.B.A. and Public

Management Certificate from Stanford Graduate School of Business, a M.S. in Telecommunications from the University of Colorado at Boulder, and a B.S. in Mechanical Engineering from the University of California at Berkeley. She is Directorship Certified through the NACD as well as a certified Qualified Technology Expert through the Digital Directors Network. She also holds GSEC, CRISC, CISM, and CISSP security certifications as well as the Certified Information Privacy Professional Europe (CIPP/E) privacy certification.

Ms. Pegueros brings to the Board extensive senior leadership experience, technological expertise and innovation, and deep knowledge in the areas of governance and organizational management.

62.     Upon information and belief, Defendant Pegueros is a citizen of Washington.

**Defendant Wesemann**

63.     Defendant Wesemann has served as a Company director since November 2004. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Compensation Committee. According to the 2023 Proxy Statement, as of August 11, 2023, Defendant Wesemann beneficially owned 400,971 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 11, 2023 was $5.08, Defendant Wesemann owned approximately $2 million worth of LivePerson stock as of that date.

64.     For the 2022 Fiscal Year, Defendant Wesemann received $262,510 in total compensation from the Company. This included $62,500 in fees earned or paid in cash and $200,010 in stock awards.

65.     The 2023 Proxy Statement stated the following about Defendant Wesemann:

Mr. Wesemann brings experience as an executive, board member and investor in various technology companies. Mr. Wesemann has been an independent consultant and an independent investor since 2002 in the software and consumer services industries. In addition to his role as a member of the Board, Mr. Wesemann has served

on the board of directors of Aclarion, Inc. (Nasdaq: ACON), a medical SAAS company that listed on Nasdaq in 2022, since 2016 and has served as its Lead Independent Director since 2022. He also serves on the boards of directors of several privately-held companies, including STATIONHEAD, a social audio company, and Mylio, a photo management company. From March 2016 until January 2019, Mr. Wesemann was CEO of LARC Networks Inc., a communication, security and privacy technology developer. Earlier in his career, Mr. Wesemann was CEO of NextPage, Inc., a provider of document management systems, CEO of netLens Inc., a peer-to-peer platform for creating distributed applications that was acquired by NextPage, and Vice President of Sales of Genesys Telecommunications Laboratories, Inc., a leader in computer-telephony integration. Mr. Wesemann received a B.A. degree from Glassboro State College (now called Rowan University).

Mr. Wesemann brings to the Board notable technology, software and sales experience, in addition to extensive CEO, management and board experience at public and private software and technology companies.

66.     Upon information and belief, Defendant Wesemann is a citizen of California.

**Defendant Zheng**

67.     Defendant Zheng has served as a Company director since December 2022. She also serves as a member of the Audit Committee and the Compensation Committee. According to the 2023 Proxy Statement, as of August 11, 2023, Defendant Zheng beneficially owned 3,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 11, 2023 was $5.08, Defendant Zheng owned approximately $15,240 worth of LivePerson stock as of that date.

68.     The 2023 Proxy Statement stated the following about Defendant Zheng:

Ms. Zheng brings over two decades of experience and leadership in B2B software, marketing and customer engagement to LivePerson. Most recently, Ms. Zheng served as Chief Marketing Officer of Bill Holdings, Inc., a provider of cloud-based software that automates back-office financial operations for small and midsize businesses. Before that, she served as Chief Marketing Officer at Tintri, Inc., a virtualization focused storage company. Ms. Zheng also previously served, on a consulting basis, as Head of Marketing of Medallia, Inc., a company offering SaaS customer experience and enterprise feedback management software. Prior to that, as part of the executive team at VMware, Inc, a software company providing cloud

computing infrastructure and services, Ms. Zheng served as Vice President of Corporate and Worldwide Marketing, and Vice President of Global Support Services. Ms. Zheng currently serves on the boards of MeridianLink, Inc., a provider of cloud-based products and services that enable financial institutions to streamline digital lending for consumers and businesses; BillTrust, Inc., a provider of cloud-based B2B accounts receivable automation products and services; and Splashtop, Inc., a remote access and remote support software company. Previously, Ms. Zheng served on the boards of Poly Inc., a global communications technology company until its acquisition by HP, Inc in August, 2022; and Stella Connect Inc., a customer feedback software company, which was acquired by Medallia in September 2020. She holds a NACD Directorship Certification from the National Association of Corporate Directors. Ms. Zheng holds an M.B.A. from the Haas School of Business at the University of California, Berkeley and a B.S. in Materials Science and Engineering from the Massachusetts Institute of Technology.

Ms. Zheng brings to the Board notable insights in corporate strategy, go-to-market operations, and executive leadership experience.

69.     Upon information and belief, Defendant Zheng is a citizen of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

70.     By reason of their positions as officers, directors, and/or fiduciaries of LivePerson and because of their ability to control the business and corporate affairs of LivePerson, the Individual Defendants owed LivePerson and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LivePerson in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LivePerson and its shareholders so as to benefit all shareholders equally.

71.     Each director and officer of the Company owes to LivePerson and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

72.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of LivePerson, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

73.     To discharge their duties, the officers and directors of LivePerson were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

74.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LivePerson, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of LivePerson's Board at all relevant times.

75.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings,

internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

76.     To discharge their duties, the officers and directors of LivePerson were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of LivePerson were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to LivePerson's own Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how LivePerson conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of LivePerson and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that LivePerson's operations would comply with all applicable laws and LivePerson's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

77.    Each of the Individual Defendants further owed to LivePerson and the shareholders the duty of loyalty requiring that each favor LivePerson's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

78.    At all times relevant hereto, the Individual Defendants were the agents of each other and of LivePerson and were at all times acting within the course and scope of such agency.

79.     Because of their advisory, executive, managerial, directorial, and controlling positions with LivePerson, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

80.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by LivePerson.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act ; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

83.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of LivePerson was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

84.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

85.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LivePerson and was at all times acting within the course and scope of such agency.

## LIVEPERSON'S CODE OF CONDUCT

86.     The Company's Code of Conduct represents that the Board "adopted this Code of Conduct as a set of guidelines for Company employees, officers, directors and consultants, intended to focus the Board of Directors and the Company's management on areas of ethical risk, provide guidance to personnel to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help to foster a culture of honesty and accountability."

87.     The Code of Conduct states that "We expect each of our employees, officers and directors to read and understand this Code of Conduct and to abide by it. The Company expects its consultants to generally abide by this Code of Conduct as well. Those who violate this Code of Conduct will be subject to disciplinary action, up to and including termination."

88.     The Code of Conduct provides, as to "Promotion of Ethical Behavior Through Discussion, Compliance and Reporting -- Reporting Any Illegal or Unethical Behavior," that:

> Employees, officers and directors should strive to identify and raise potential issues before they lead to problems, and should ask a supervisor, manager or other appropriate personnel about the application of this Code of Conduct whenever in doubt. An employee, officer or director who becomes aware of any existing or potential violation of this Code of Conduct or any other illegal or unethical behavior by any officer, director or employee or by anyone purporting to be acting on the Company's behalf should promptly notify the General Counsel, the Chief Executive Officer, the Chief Financial Officer or the Chairperson of the Audit Committee (the "Audit Committee") of the Board of Directors (collectively, the "Compliance Team").

> Any employee, officer or director can also anonymously report the existing or potential violation by delivering the report via regular mail to c/o Audit Committee, LivePerson, Inc., 475 Tenth Avenue, Fifth Floor, New York, New York 10018. See the Company's Whistleblower Policy for more information about making anonymous reports about accounting and financial matters.

89.     The Code of Conduct provides, as to "Conflicts of Interest," the following, in relevant part:

> A "conflict of interest" occurs when an individual's private interest interferes in any way – or even appears to interfere – with the interests of the Company as a whole. While our employees, officers and directors are free to make personal investments and enjoy social relations and normal business courtesies, they must not have any personal interests that adversely influence the performance of their job responsibilities. A conflict situation can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her Company work objectively and effectively. Conflicts of interest also arise when an employee, officer or director, or a member of his or her family, receives improper personal benefits as a result of his or her position in the Company, whether received from the Company or a third party. Gifts to, loans to, or

guarantees of obligations of, employees, officers and directors and their respective family members may create conflicts of interest. Federal law prohibits personal loans from the Company to directors and executive officers. In addition, in general, it is a conflict of interest for a Company employee or officer to work simultaneously for a competitor, customer or supplier absent an express written consent or waiver from the Company. Conflicts of interest also arise when employees have a direct or indirect ownership in a non-public company that is a competitor of the Company or is doing business with the Company.

Conflicts of interest are prohibited as a matter of Company policy, unless they have been approved by the Company. Service to the Company should never be subordinated to personal gain and advantage. Conflicts of interest should, to the extent possible, be avoided. Conflicts are not always clear-cut. Any employee, officer or director who becomes aware of a material transaction or relationship that could reasonably be expected to give rise to a conflict of interest, or has a question as to a potential conflict, should discuss the matter promptly with a member of the Compliance Team.

90.   The Code of Conduct provides, as to "Fair Dealing," that:

The Company does not seek competitive advantages through illegal or unethical business practices. Each employee, officer and director should endeavor to deal fairly with the Company's clients, service providers, suppliers, competitors and employees. No employee, officer or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair-dealing practice. Stealing proprietary information, misusing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited.

91.   The Code of Conduct provides, as to "Protection and Proper Use of Corporate

Assets," that:

In carrying out their duties and responsibilities, employees, officers and directors should protect the Company's assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability. Company assets, such as facilities, supplies, materials, intellectual property, information and other assets owned or leased by the Company, or that are otherwise in the Company's possession, should be used only for legitimate business purposes of the Company. Incidental personal use may be appropriate for certain Company assets, but an employee should check with a supervisor to determine what may be appropriate.

92.     The Code of Conduct provides, as to "Full, Fair, Accurate, Timely and Understandable Disclosure," that:

> It is the Company's policy to make full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits to, the Securities and Exchange Commission, any other applicable federal or state agency, and in other public communications made by the Company. All employees, officers and directors should promptly bring to the attention of the Audit Committee any material information of which they may become aware that affects the disclosures made by the Company in its public filings or otherwise.

> Depending on their respective positions with the Company, employees, officers or directors may be called upon to provide information necessary to assure that the Company's public reports meet these requirements. The Company expects employees, officers and directors to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

93.     The Code of Conduct provides, as to "Compliance with Laws, Rules and Regulations," that:

> All employees, officers and directors of the Company must comply with all of the laws, rules and regulations of the United States and other countries, as well as the states, counties, cities and other jurisdictions, applicable to the Company or its business and refrain from any form of illegal, dishonest or unethical conduct. As a public reporting company with its stock trading on Nasdaq, the Company is also subject to the applicable listing standards of the Nasdaq Global Select Market.

> This Code of Conduct does not attempt to summarize all laws, rules and regulations applicable to the Company or its business. You should consult the various guidelines the Company has prepared on specific laws, rules and regulations, which you can find summarized in the Employee Handbook, including employment laws concerning equal employment and sexual and other types of harassment; immigration laws concerning hiring of documented workers; antitrust laws; environmental laws; occupational health and safety laws; food and drug laws; securities laws concerning disclosure requirements and insider trading; and anti-bribery laws including foreign corrupt practices. Employees should consult with a supervisor if they have questions about laws they think may be applicable to the Company or its business.

> Generally, it is both illegal and against Company policy for any employee, officer or director who is aware of material nonpublic information relating to the Company

to buy or sell any securities of the Company, or recommend that another person buy, sell or hold the securities of the Company. More detailed rules governing the trading of securities by the Company's employees, officers and directors are set forth in the Company's Insider Trading Policy. Any employee, officer or director who is uncertain about the legal rules involving his or her purchase or sale of any Company securities should consult with the Company's Insider Trading Compliance Officer (currently the General Counsel) before making any such purchase or sale.

94.     The Code of Conduct provides, as to "Accounting Complaints," the following:

The Audit Committee is responsible for establishing procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters. Employees, officers or directors who have concerns or complaints regarding such matters are encouraged to promptly submit those concerns or complaints to the Audit Committee, which, subject to its duties arising under applicable law, regulations and legal proceedings, will treat such submissions confidentially. Such submission may be directed to c/o Audit Committee, LivePerson, Inc., 475 Tenth Avenue, Fifth Floor, New York, New York 10018. See the Company's Whistleblower Policy for more information about making anonymous reports about accounting and financial matters. No one will be subject to retaliation because of a good faith report of a suspected violation.

95.     Regarding "Authority to Grant Waivers," the Code of Conduct states the following:

From time to time, the Company may waive certain provisions of this Code of Conduct. Any employee, officer or director who believes that a waiver may be called for should discuss the matter with a member of the Compliance Team. Waivers for executive officers (including senior financial officers) or directors of the Company may be made only by the Board of Directors.

96.     In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including, but not limited to, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, breaches of fiduciary duty, gross mismanagement, and unjust enrichment. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. In violation

of the Code of Conduct, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

## LIVEPERSON'S CODE OF ETHICS

97.     The Company also maintains a Code of Ethics specifically targeted to LivePerson's "Chief Executive Officer and Senior Financial Officers." The Code of Ethics provides that the "Board of Directors is responsible for setting the standards of conduct contained in this Code of Ethics and for updating these standards as appropriate to reflect legal and regulatory developments."

98.     The Board adopted the Code of Ethics to "promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications made by the Company; compliance with applicable governmental rules and regulations; the prompt internal reporting of violations of the Code of Ethics to an appropriate person or persons identified herewith and accountability for adherence to this Code of Ethics."

99.     The Code of Ethics further maintains that the Individual Defendants are "bound by the requirements and standards of both the Company's Code of Conduct and this Code of Ethics, as well as those set forth in all other applicable policies, procedures and guidelines provided by the Company to employees."

100.    The Code of Ethics requires the Individual Defendants to do the following, in relevant part:

- Endeavor to act with honesty and integrity, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, as further discussed in the Code of Conduct, and the observance of both the form and the spirit of technical and ethical compliance and accounting standards.

- Act in good faith, responsibly, and with due care, competence and diligence, without misrepresenting or omitting material facts or allowing one's independent judgment to be compromised.

- Promote full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits to, the Securities and Exchange Commission or other applicable federal, foreign or state agency, and in other public communications made by the Company, and to promptly bring to the attention of the Audit Committee of the Board of Directors (the "Audit Committee") any material information of which they may become aware that affects the disclosures made by the Company in its public filings or otherwise.

- Promptly bring to the attention of the Audit Committee any information they may have concerning: (a) significant deficiencies in the Company's disclosure controls and procedures that could adversely affect the Company's ability to record, process, summarize and report, within the time periods specified in the Securities and Exchange Commission's or other applicable federal, foreign or state agency's rules and forms, the information required to be disclosed by the Company in the reports that the Company files or submits under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure; or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, internal control over financial reporting or disclosure controls and procedures.

- Endeavor to comply, and to cause the Company to comply, with applicable governmental laws, rules and regulations and promptly bring to the attention of the Audit Committee any information they may have concerning evidence of a material violation of the securities or other laws,

rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

- Accept accountability for adherence to this Code of Ethics, including promptly reporting to the Audit Committee any information they may have concerning evidence of a material violation of this Code of Ethics.

101.    The Code of Ethics also states the following regarding the Board following the

Code of Conduct, Code of Ethics, and any waivers to the Code of Ethics:

> The Chief Executive Officer and Senior Financial Officers are expected to adhere to this Code of Ethics. The Company shall determine appropriate actions to be taken in the event of violations of this Code of Ethics by any of these employees and as set forth in the Company's Code of Conduct. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code of Ethics. Waivers of this Code of Ethics may only be made by the Board of Directors. The Company will also appropriately disclose any substantive amendment to, and any material waiver of, any provision of this Code of Ethics that applies to these employees pursuant to the Exchange Act and the applicable rules of each stock exchange on which the Company's shares are listed or quoted.

102.    In violation of the Code of Ethics, the Individual Defendants (as key officers and

as members of the Company's Board) conducted little, if any, oversight of the Company's

engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public and to facilitate and disguise the Individual Defendants' violations of law,

including, but not limited to, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act,

breaches of fiduciary duty, gross mismanagement, and unjust enrichment. In violation of the Code

of Ethics, the Individual Defendants consciously disregarded their duties to comply with the

applicable laws and regulations, engage in fair dealing, avoid using corporate opportunities for

personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records,

accounts, and financial statements, and make accurate filings with the SEC.

**LIVEPERSON'S AUDIT COMMITTEE CHARTER**

103.    The Company also maintains an Audit Committee Charter. The purpose of the

Audit Committee is to oversee:

> the accounting and financial reporting processes of the Company and audits of its
> financial statements; the effectiveness of the Company's internal control over
> financial reporting, including the performance of the Company's internal audit
> function; the Company's compliance with legal and regulatory, accounting and
> financial reporting requirements, including internal controls and whistle-blower
> procedures designed for that purpose and its Code of Conduct and its Code of Ethics
> for the Chief Executive Officer and Senior Financial Officers, and programs
> established in accordance therewith; the Company's independent registered public
> accounting firm's qualifications, performance and independence; and the
> Company's enterprise risk management framework and its policies and procedures
> for risk management.

104.    The primary role of the Audit Committee is to "oversee the financial reporting and

disclosure process."

105.    Regarding "Authority and Responsibility," the Audit Committee Charter states the

following:

> 9. Review with management any significant changes to GAAP, SEC and other
> accounting policies or standards that will impact or could impact the financial
> reports under review. 10. Review significant changes to the Company's accounting
> principles and practices proposed by the independent auditor, the internal auditor,
> if any, or management.
>
> 11. Instruct the independent auditor and the internal auditor, if any, to advise the
> Audit Committee if there are any subjects that require special attention.
>
> 12. Instruct the independent auditor to report to the Audit Committee on all critical
> accounting policies of the Company, all alternative treatments of financial
> information within GAAP that have been discussed with management,
> ramifications of the use of such alternative disclosures and treatments and the
> treatment preferred by the independent auditor, and other material written
> communication between the independent auditor and management, and discuss
> these matters with the independent auditor and management.
>
> 13. Meet with management and the independent auditor to discuss the annual
> financial statements, Management's Discussion and Analysis of Financial

Condition and Results of Operations, and the report of the independent auditor with respect to such annual financial statements and to discuss significant issues encountered in the course of the audit work, including: restrictions on the scope of activities; access to required information; significant disagreements with management; the adequacy of internal controls, including any special steps adopted in light of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting identified during the course of the annual audit, and the adequacy of disclosures about changes in internal control over financial reporting; the adequacy of the disclosure of off-balance sheet transactions, arrangements, obligations and relationships in reports filed with the SEC; any items the Company's independent auditor is required to communicate in accordance with auditing procedures and standards; and the appropriateness of the presentation of any non-GAAP financial measures (as defined in the Regulations) included in any report filed with the SEC or in any public disclosure or release; as well as management's response to such matters.

18. Review disclosures made to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

19. Discuss with management any evidence of a material violation of the Company's Code of Conduct, or the Company's Code of Ethics for the Chief Executive Officer and Senior Financial Officers, or programs established in connection therewith, including evidence of a material violation of securities laws or breaches of fiduciary duty by the Company.

21. Have such direct and independent interaction with members of management, including the Company's Chief Financial Officer and the senior internal audit executive, if any, as the Audit Committee believes appropriate.

22. Review and discuss with management and the independent auditor management's report on internal control over financial reporting, and the independent auditor's audit of the effectiveness of the Company's internal control over financial reporting and its attestation report, prior to the filing of the Form 10-K.

23. Following review and discussions, if so determined by the Audit Committee, recommend to the Board that the annual financial statements be included in the Company's annual report on Form 10-K.

24. Generally review and discuss the Company's earnings press releases, as well as any financial information and earnings guidance provided to analysts and rating agencies.

25. Discuss with management and the independent auditor the quarterly financial statements prior to the filing of the Form 10-Q, including Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein; provided that this responsibility may be delegated to the chairman of the Audit Committee or a member of the Audit Committee who is a financial expert.

31. Periodically review and discuss with the Company's General Counsel any legal matter, including legal cases against or regulatory investigations involving the Company or material violations of the Company's Code of Business Conduct and Ethics or programs established in connection therewith, that could have a significant impact on the Company's financial statements.

32. Discuss with the Company's lead inside or outside legal counsel any legal matters that may have a material impact on the financial statements or the Company's compliance policies.

33. Discuss with the independent auditor and management the Company's risk assessment and risk management guidelines, policies and processes.

34. On behalf of the Board, oversee the principal risk exposures facing the Company and the Company's mitigation efforts in respect of such risks, including, but not limited to financial reporting risks, and credit and liquidity risks.

106.    In violation of the Audit Committee Charter, the Individual Defendants sitting on the Audit Committee during the Relevant Period failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

107.    Incorporated in Delaware in 1995 and headquartered in New York City, LivePerson, since November 1998, has offered online and mobile messaging solutions for businesses, purportedly providing businesses with "conversational solutions to orchestrate humans and AI, at scale, and create a convenient and personalized relationship with their customers." The Company went public via an IPO on the NASDAQ in April 2000.

108.    LivePerson claims that its "Conversational Cloud" enables customers to interact with chat bots, or automated internet chat robots, across "each of a brand's primary digital channels, including mobile apps, mobile and desktop web browsers, SMS, social media, and third-party consumer messaging platforms." This service purportedly allows human agents to manage customer correspondence in a more streamlined and efficient manner by giving customers solutions faster instead of having to wait on hold on a phone call. LivePerson's Conversational Cloud can also purportedly "ingest traditional emails and convert them into messaging conversations, or embed messaging conversations directly into web advertisements, rather than redirect consumers to static website landing pages."

109.    In February 2022, LivePerson acquired Lexington, Kentucky-based WildHealth, a precision medicine service that purports to "leverage[] advanced machine learning to combine DNA analysis, biometrics, microbiome testing and phenotypic data to provide people with a blueprint for truly optimized health and a maximized health span." LivePerson acquired WildHealth in an effort to bolster its offerings in the healthcare space, thereafter combining LivePerson's Conversational AI with WildHealth to purportedly allow business-to-business healthcare companies to "scale and personalize patient engagement." WildHealth's business model includes receiving reimbursements from Medicare for furnishing certain services.

37

110.    Just months after LivePerson's acquisition of WildHealth, WildHealth received notice that certain reimbursements for the Medicare COVID-19 Testing Program were suspended pending further review.

**False and Misleading Statements**

***May 10, 2022 Form 10-Q***

111.    On May 10, 2022, after the market closed, LivePerson filed its quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2022 (the "1Q 2022 10-Q"). The 1Q 2022 10-Q was signed by Defendants LoCascio and Collins and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the 1Q 2022 10-Q's accuracy and disclosure of all weaknesses in internal controls, which were signed by Defendants LoCascio and Collins.

112.    The 1Q 2022 10-Q stated the following about the sufficiency of the Company's internal controls:

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of March 31, 2022*** to ensure that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the three months ended March 31, 2022 identified in connection with the evaluation

thereof by our management, including the Chief Executive Officer and Chief Financial Officer, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

### 2022 Proxy Statement

113.    On July 21, 2022, LivePerson filed the 2022 Proxy Statement with the SEC. Defendants Cu, Layfield, Wesemann, Block, Mossler, Lavan, and LoCascio solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

114.    The 2022 Proxy Statement called for shareholder approval of, *inter alia*: (1) the reelection of Defendants Cu, Layfield, and Wesemann to the Board; (2) the ratification of the appointment of BDO USA, LLP, as the independent registered public accounting firm of the Company for the 2022 Fiscal Year; and (3) the approval, by advisory vote, of the compensation of the Company's named executive officers.

115.    With respect to the Company's Risk Oversight, the 2022 Proxy Statement stated the following:

> The Board provides oversight of the Company's management of risk. Senior management has responsibility for the management of risk and reports to the Board as needed with respect to its ongoing enterprise risk management efforts. Given the heightened importance and relevance of risks related to privacy, data use and cybersecurity, the Board as a whole oversees management of these risks. In exercising its oversight of risk management, the Board has delegated to the Audit Committee primary responsibility for the oversight of risks related to the Company's financial statements, internal controls, disclosure controls, and related processes. As discussed in more detail below, the Board has delegated to the Compensation Committee primary responsibility for the oversight of risk related to the Company's compensation policies and practices. The Board has delegated to the Nominating and Corporate Governance Committee primary responsibility for the oversight of risk related to the Company's corporate governance practices. Each

committee reports as needed to the full Board with respect to such committee's particular risk oversight responsibilities.

116.    Regarding the Code of Conduct and the Code of Ethics, the 2022 Proxy Statement stated the following:

> The Board has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates, corporate governance policies, and standards applicable to us in general. In addition, the Board has adopted a Code of Conduct applicable to all of our employees, including our executive officers, and our non-employee directors, as well as a Code of Ethics for the Chief Executive Officer and Senior Financial Officers. The Code of Conduct and Code of Ethics can be found at *https://ir.liveperson.com/corporate-governance/governance-overview.*

117.    The 2022 Proxy Statement was materially false and misleading because it failed to disclose that, contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct or the Code of Ethics.

118.    The 2022 Proxy Statement also failed to disclose, *inter alia,* that: (1) the Company's internal controls pertaining to disclosure controls and procedures were materially ineffective; (2) the Company failed to maintain internal controls over financial reporting, as they contained material weaknesses; (3) as a result, the Company failed to disclose the suspension of WildHealth's Medicare reimbursements under the Testing Program and the resulting impact on LivePerson's future revenues; and (4) as a further result, the Company exaggerated and overstated its business prospects and overall financial position. As a result of the foregoing, Defendants' statements about LivePerson's business, operations, and prospects were materially false and misleading and/or

lacked a reasonable basis at all relevant times.

119.    As a result of Defendants Cu, Layfield, Wesemann, Block, Mossler, Lavan, and LoCascio causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Cu, Layfield, and Wesemann to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

### *August 9, 2022 Form 10-Q*

120.    On August 9, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2022 (the "2Q 2022 10-Q"). The 2Q 2022 10-Q was signed by Defendants LoCascio and Collins and contained SOX certifications signed by Defendants LoCascio and Collins attesting to the 2Q 2022 10-Q's accuracy.

121.    The 2Q 2022 10-Q stated the following about the sufficiency of the Company's internal controls:

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

**Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2022** to ensure that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting during the three months ended June 30, 2022 identified in connection with the evaluation thereof by our management, including the Chief Executive Officer and Chief

Financial Officer, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

### *November 7, 2022 Press Release*

122.   On November 7, 2022, after the market closed, LivePerson issued a press release on Form 8-K with the SEC wherein it announced its third quarter of 2022 financial results. The press release declared that the Company expected strong, positive performance from WildHealth, stating the following, in relevant part:

> ***As for guidance, we expect continued strong performance by WildHealth and elevated professional services in the fourth quarter. Considering those expectations, coupled with more upsells and early renewals in the third quarter than previously expected, we are raising revenue guidance for the full year.*** We now expect revenue in a range of $517 million to $521 million, or 10% to 11% year over year growth, an improvement to the midpoint of approximately $6 million. For full year adjusted EBITDA, due to our current expectation for potential revenue upside and additional P&L optimizations, we are reaffirming our previous guidance range of $1 million to $10 million.

(Emphasis added.)

### *November 8, 2022 Form 10-Q*

123.   On November 8, 2022, after market hours, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2022 (the "3Q 2022 10-Q"). The 3Q 2022 10-Q was signed by Defendants LoCascio and Collins and contained SOX certifications signed by Defendants LoCascio and Collins attesting to the 3Q 2022 10-Q's accuracy.

124.   The 3Q 2022 10-Q stated the following about the sufficiency of the Company's internal controls, in relevant part:

### Item 4. Controls and Procedures

*Evaluation of Disclosure Controls and Procedures*

***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2022*** to ensure that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting during the three months ended September 30, 2022 identified in connection with the evaluation thereof by our management, including the Chief Executive Officer and Chief Financial Officer, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

125.    The statements identified in ¶¶ 111-112 and 120-124 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company's internal controls pertaining to disclosure controls and procedures were materially ineffective; (2) the Company failed to maintain internal controls over financial reporting, as they contained material weaknesses; (3) as a result, the Company failed to disclose the suspension of WildHealth's Medicare reimbursements under the Testing Program and the resulting impact on LivePerson's future revenues; and (4) as a further result, the Company exaggerated and overstated its business prospects and overall financial position. As a result of the foregoing, Defendants' statements about LivePerson's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

126.    On February 28, 2023, before the market opened, LivePerson issued a Notification

of Late Filing on Form 12b-25, announcing that the Company would be unable to timely file its

Annual Report on Form 10-K with the SEC:

> ***The Company has determined that it is unable to file its Form 10-K within the prescribed time period provided by the applicable rules of the Securities and Exchange Commission without unreasonable effort and expense.***
>
> ***In view of the in-process integration of the Company's 2022 acquisition of WildHealth, the Company requires more time to perform additional review and testing of revenue recognition with respect to a recently discontinued WildHealth program, for which Medicare reimbursement is suspended pending further governmental review, and to complete its in-process review of internal controls and procedures.***
>
> The Company currently anticipates filing its Form 10-K for the year ended December 31, 2022 within the fifteen calendar day grace period provided by Rule 12b-25.

 (Emphasis added.)

127.    On this news, LivePerson's stock price fell $1.69 per share, or 14.31%, from a

closing price of $11.81 per share on February 27, 2023 to close at $10.12 per share on February

28, 2023.

128.    A week later, on March 6, 2023, before the market opened, LivePerson filed a

current report on Form 8-K with the SEC that revealed to investors that the Company's acquisition

of WildHealth would deal a blow to the Company's fourth quarter of 2022 revenue because of the

suspension of Medicare reimbursements in November 2022. In relevant part, the Form 8-K stated

the following:

> On February 28, 202[3], LivePerson, Inc. (the "Company") filed a Notification of Late Filing on Form 12b-25 stating it was unable to file its Form 10-K for the year

ended December 31, 2022 within the prescribed time period without unreasonable effort or expense because it required additional time to complete a review of revenue associated with a recently discontinued program of its subsidiary Wild Health, and to complete its in-process review of internal controls and procedures.

***To provide additional clarity to investors, the Company notes that the referenced review of WildHealth revenue is anticipated to affect fourth quarter 2022 revenue attributable to WildHealth's participation in a Medicare demonstration program, due to suspension in November 2022 of Medicare reimbursements under the program and pending further governmental review.***

The Company currently anticipates filing its Form 10-K for the year ended December 31, 2022 within the fifteen calendar day grace period provided by Rule 12b-25.

(Emphasis added.)

129.    On this news, LivePerson's stock price fell $0.78 per share, or 6.8%, from a closing price of $11.47 per share on February 27, 2023 to close at $10.69 per share on March 7, 2023.

130.    Approximately one week later, on March 15, 2023, after the market closed, LivePerson issued a press release that disclosed the Company's fourth quarter of 2022 financial results. The press release revealed a drop in revenue, stating the following, in relevant part:

**Fourth Quarter Highlights**

***Total revenue was $122.5 million for the fourth quarter of 2022, a decrease of 1% as compared to the same period last year*** as the company continues to execute on its plan to exit non-core lines of business. ***Within total revenue, business operations revenue for the fourth quarter of 2022 decreased 1% from the comparable prior-year period to $113.0 million, and revenue from consumer operations decreased 3% from the comparable prior-year period to $9.4 million.***

(Emphasis added.)

131.    The truth fully emerged on March 16, 2023 when, before the market opened, LivePerson belatedly filed its 2022 10-K with the SEC.  The 2022 10-K stated the following, in relevant part:

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, including the Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures," as that term is defined in Rule 13a-15(e) promulgated under the Exchange Act, as of December 31, 2022.

Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, due to certain control deficiencies which aggregated to a material weakness in the Company's internal control over financial reporting as further described below, our disclosure controls and procedures were not effective as of December 31, 2022.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management evaluated the effectiveness of our internal control over financial reporting as of December 31, 2022 based on the framework established in "Internal Control — Integrated Framework (2013)," issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). ***As a result of its review, management identified deficiencies in the Company's internal control over financial reporting as of December 31, 2022 that in the aggregate constitute a material weakness as further discussed below. As a result, our management concluded that as of December 31, 2022, our internal control over financial reporting was not effective.***

***The control deficiencies, which in aggregate constitute a material weakness, were identified in connection with the Company's previously disclosed review of certain transactions related to its subsidiary WildHealth, which was acquired in February 2022, and primarily include a combination of ineffective operation of controls and inadequate controls related to: formal review, approval, and evaluation of non-core, complex transactions as well as engagement with government agencies; segregation of duties between accounting and contracting approval functions for non-core, complex transactions; and formal review, approval and evaluation of manual journal entries.***

(Emphasis added.)

132.    On this news, LivePerson's stock price fell $5.64 per share, or 57.73%, from a closing price of $9.77 per share on March 15, 2023 to close at $4.13 per share on March 16, 2023.

**Repurchases During the Relevant Period**

133.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $221,301 to repurchase approximately 19,830 shares of its own common stock at artificially inflated prices between November 1, 2022 and November 30, 2022.

134.    According to the 2022 10-K, between November 1, 2022 and November 30, 2022, the Company purchased 19,830 shares of its common stock from Defendant Collins for approximately $221,301 at an average price of $11.17 per share.

135.    As the Company's stock was actually worth only $4.13 per share, the price at closing on March 16, 2023, the Company overpaid by approximately $139,403 for repurchases of its own stock from Defendant Collins between November 1, 2022 and November 30, 2022.

136.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $139,403.

**DAMAGES TO LIVEPERSON**

137.    As a direct and proximate result of the Individual Defendants' conduct, LivePerson has lost and expended, and will continue to lose and expend, many millions of dollars.

138.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

139.    Such expenditures and losses include the $139,403 the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

140.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

141.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

142.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

143.    As a direct and proximate result of the Individual Defendants' conduct, LivePerson has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

144.    Plaintiffs bring this action derivatively and for the benefit of LivePerson to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of LivePerson, unjust enrichment, abuse of control,

gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

145.    LivePerson is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146.    Plaintiffs are, and have been at all relevant times, shareholders of LivePerson. Plaintiffs will adequately and fairly represent the interests of LivePerson in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

147.    Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

148.    A pre-suit demand on the Board of LivePerson is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Layfield, Hansen, Lavan, Pegueros, Wesemann, and Zheng (the "Director Defendants"), along with non-parties Jim Miller and Anthony John Sabino (together with the Director Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

149.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by nearly $139,403 for repurchases of its own stock from Defendant Collins, all of

which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

150. Demand is excused as to nonparty Anthony John Sabino as he is an interested director from his role as the CEO of the Company. Due to his role as CEO, he cannot disinterestedly and impartially investigate the charges and decide whether to pursue action against the Director Defendants and the other perpetrators of the scheme, as he depends upon the Director Defendants for his livelihood. As a result, non-party Anthony John Sabino is not independent or disinterested. Thus, demand upon non-party Anthony John Sabino is futile and excused.

151. Moreover, three of the Director Defendants solicited the 2022 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

152. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted LivePerson to issue materially false and misleading statements. Specifically, the Director Defendants caused the Company to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

153. Additional reasons that demand as to Defendant Layfield is futile follow. Defendant Layfield has served as the Chair of the Board since July 2023 and as a Company director since November 2016. She previously served as the Lead Independent Director. Defendant Layfield also

serves as a member of the Company's Audit Committee, Nominating and Corporate Governance Committee, and as Chair of the Compensation Committee. For her services, Defendant Layfield is paid handsomely by the Company, receiving $265,010 in total compensation from the Company for the 2022 Fiscal Year alone. As the Company's trusted Chair of the Board, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Layfield also solicited the false and misleading 2022 Proxy Statement, which led to, *inter alia*, her re-election to the Board, thereby allowing her to continue to breach her fiduciary duties to the Company. As a result, Defendant Layfield breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Layfield is futile and excused.

154.    Additional reasons that demand as to Defendant Hansen is futile follow. Defendant Hansen has served as a Company director since December 2022. He also serves as a member of the Company's Audit Committee and Operating Committee. As a trusted Company director, Defendant Hansen conducted little, if any, oversight of the scheme to cause LivePerson to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Hansen breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Hansen is futile and excused.

155.     Additional reasons that demand as to Defendant Lavan is futile follow. Defendant Lavan has served as Company director since January 2000. He also serves as a member of the Company's Compensation Committee, Operating Committee, and as Chair of the Company's Audit Committee. He has received and continues to receive handsome compensation for his role as a director, including $267,510 in total compensation from the Company for the 2022 Fiscal Year alone. In addition, he solicited the false and misleading 2022 Proxy Statement. As a trusted Company director, Defendant Lavan conducted little, if any, oversight of the scheme to cause LivePerson to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Lavan breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Lavan is futile and excused.

156.     Additional reasons that demand as to Defendant Pegueros is futile follow. Defendant Pegueros has served as a Company director since December 2022. She also serves as a member of the Company's Compensation Committee, Nominating and Corporate Governance Committee, and as Chair of the Operating Committee. As a trusted Company director, Defendant Pegueros conducted little, if any, oversight of the scheme to cause LivePerson to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Pegueros breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Pegueros is futile and excused.

157.    Additional reasons that demand as to Defendant Wesemann is futile follow. Defendant Wesemann has served as Company director since November 2004. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Compensation Committee. He has received and continues to receive handsome compensation for his role as a director, including $262,510 in total compensation from the Company for the 2022 Fiscal Year alone. He also solicited the false and misleading 2022 Proxy Statement which led to, *inter alia*, his re-election to the Board, thereby allowing him to continue to breach his fiduciary duties to the Company. As a trusted Company director, Defendant Wesemann conducted little, if any, oversight of the scheme to cause LivePerson to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Wesemann breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Wesemann is futile and excused.

158.    Additional reasons that demand as to Defendant Zheng is futile follow. Defendant Zheng has served as a Company director since December 2022. She also serves as a member of the Audit Committee and Compensation Committee. As a trusted Company director, Defendant Zheng conducted little, if any, oversight of the scheme to cause LivePerson to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Zheng breached her fiduciary duties, faces a substantial likelihood of

liability, and is not independent or disinterested. Thus, demand upon Defendant Zheng is futile and excused.

159.    Additional reasons that demand on the Board is futile follow.

160.    Each of the Director Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by thousands of dollars for its own common stock during the Relevant Period from one of the primary wrongdoers, Defendant Collins. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus excused.

161.    Defendants Lavan, Layfield, and Wesemann (the "Audit Committee Defendants") served as members of the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by failing to adequately exercise their risk management and risk assessment functions and failing to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties and are not disinterested or independent. Therefore, demand is further excused and futile as to the Audit Committee Defendants.

162.    In violation of the Code of Conduct and Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct and Code of Ethics by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and Code of Ethics and the law. Thus, the Director Defendants breached the Company's own Code of Conduct and Code of Ethics, are not disinterested, and demand is excused as to them.

163.    LivePerson has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for LivePerson any part of the damages LivePerson suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

164.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

165.    The acts complained of herein constitute violations of fiduciary duties owed by LivePerson's officers and directors, and these acts are incapable of ratification.

166.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of LivePerson. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of LivePerson, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

167.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause LivePerson to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

168.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

146.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

147.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

148.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

149.    Under the direction and watch of Defendants Cu, Layfield, Wesemann, Block, Mossler, Lavan, and LoCascio, the 2022 Proxy Statement failed to disclose that, contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct and the Code of Ethics.

150.    The 2022 Proxy Statement also failed to disclose that: (1) the Company's internal controls pertaining to disclosure controls and procedures were materially ineffective; (2) the Company failed to maintain internal controls over financial reporting, as they contained material weaknesses; (3) as a result, the Company failed to disclose the suspension of WildHealth's Medicare reimbursements under the Testing Program and the resulting impact on LivePerson's future revenues; and (4) as a further result, the Company exaggerated and overstated its business prospects and overall financial position. As a result of the foregoing, Defendants' statements about LivePerson's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

151.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including, but not limited to, the re-election of Defendants Cu, Layfield, and Wesemann to the Board.

152.    The false and misleading elements of the 2022 Proxy Statement led to, among other things, the re-election of Defendants Cu, Layfield, and Wesemann, which allowed them to continue to breach their fiduciary duties to LivePerson.

153.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

154.    Plaintiffs, on behalf of LivePerson, have no adequate remedy at law.

**SECOND CLAIM**

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

155.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

156.     The Individual Defendants participated in the scheme to defraud with the purpose and effect of defrauding LivePerson. Not only is LivePerson now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon LivePerson by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially-inflated prices from Defendant Collins, damaging LivePerson.

157.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

158.     The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LivePerson not misleading.

159.    The Individual Defendants, as top executives and directors at the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by LivePerson.

160.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

161.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

162.    Plaintiffs, on behalf of LivePerson, have no adequate remedy at law.

## THIRD CLAIM

**Against Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

163.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

164.    The Individual Defendants, by virtue of their positions with LivePerson and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of LivePerson and each of its officers and directors who made the false and misleading statements alleged herein

within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause LivePerson to engage in the illegal conduct and practices complained of herein.

165.    Plaintiffs, on behalf of LivePerson, have no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

166.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

167.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of LivePerson's business and affairs.

168.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

169.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of LivePerson.

169.    In breach of their fiduciary duties owed to LivePerson, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's internal controls pertaining to disclosure controls and procedures were materially ineffective; (2) the Company failed to maintain internal controls over financial reporting, as they contained material weaknesses; (3) as a result, the Company failed to disclose the suspension of

WildHealth's Medicare reimbursements under the Testing Program and the resulting impact on LivePerson's future revenues; and (4) as a further result, the Company exaggerated and overstated its business prospects and overall financial position. As a result of the foregoing, Defendants' statements about LivePerson's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

170.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

171.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

172.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $4,445.

173.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

174.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were

not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of LivePerson's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

175.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

176.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, LivePerson has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177.    Plaintiffs, on behalf of LivePerson, have no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

178.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

179.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, LivePerson.

180.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from LivePerson that was tied to the

performance or artificially inflated valuation of LivePerson, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

181.    Plaintiffs, as shareholders and representatives of LivePerson, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary and contractual duties.

182.    Plaintiffs, on behalf of LivePerson, have no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Abuse of Control

183.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

184.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence LivePerson, for which they are legally responsible.

185.    As a direct and proximate result of the Individual Defendants' abuse of control, LivePerson has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiffs, on behalf of LivePerson, have no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

187.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

188.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of LivePerson in a manner consistent with the operations of a publicly-held corporation.

189.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, LivePerson has sustained and will continue to sustain significant damages.

190.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

191.     Plaintiffs, on behalf of LivePerson, have no adequate remedy at law.

## EIGHTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

192.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

193.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

194.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

195.    In addition, the Individual Defendants caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

196.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

197.    Plaintiffs, on behalf of LivePerson, have no adequate remedy at law.

## NINTH CLAIM

**Against Defendants LoCascio and Collins for Contribution Under Sections 10(b) and 21D of the Exchange Act**

198.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

199.    LivePerson and Defendants LoCascio and Collins are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant LoCascio's and Defendant Collins's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

200.    Defendants LoCascio and Collins, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

201.    Accordingly, Defendants LoCascio and Collins are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

202.    As such, LivePerson is entitled to receive all appropriate contribution or indemnification from Defendants LoCascio and Collins.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of LivePerson, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to LivePerson;

(c)    Determining and awarding to LivePerson the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing LivePerson and the Individual Defendants to take all necessary actions to reform and improve LivePerson's corporate governance and internal procedures to comply with applicable laws and to protect LivePerson and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of

Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2.  a provision to permit the shareholders of LivePerson to nominate at least four candidates for election to the Board;

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

      (e)    Awarding LivePerson restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.


Dated: January 26, 2024

                              **THE BROWN LAW FIRM, P.C.**

                              */s/ Timothy Brown*_____
                              Timothy Brown
                              Saadia Hashmi
                              767 Third Avenue, Suite 2501
                              New York, NY 10017

Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
      shashmi@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
      eitank@bgandg.com

*Counsel for Plaintiffs*

## <u>VERIFICATION</u>

I, Guillermo Marti, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

26 __
I declare under penalty of perjury that the foregoing is true and correct.  Executed this day of January, 2024.

DocuSigned by:

*Guillermo Marti*

1A9FE288EBC042E...

Guillermo Marti

## **VERIFICATION**

I, Felicia Marti JT Ten, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26 day of January, 2024.

DocuSigned by:

BF3323A30CF3498...

Felicia Marti JT Ten